1
2
3
4
5
6           IN THE UNITED STATES DISTRICT COURT
7
8           FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10   R.C. FISCHER AND COMPANY,                No. C-09-02316 EDL
11           Plaintiff,                       **FINDINGS OF FACT AND**
                                              **CONCLUSIONS OF LAW FOLLOWING**
                                              **COURT TRIAL**
12     v.
13   CHARLES CARTWRIGHT,
14           Defendant.
     _____/
15
16          Plaintiff R.C. Fisher and Company brought this action for indemnity against Defendant
17   Charles Cartwright arising from a collision between two sailing vessels, Quark Speed and Inkatu, in
18   the San Francisco Bay on June 24, 2007.  Plaintiff was the insurance broker for the owners of Quark
19   Speed that paid for a portion of the repairs to Quark Speed on behalf of Quark Speed's owners.
20   Defendant is the owner of Inkatu.  The parties consented to a court trial before a magistrate judge
21   pursuant to 28 U.S.C. § 636(c).  This matter was tried to the Court on July 21 and 22, 2011.  Fateh
22   Sahota represented Plaintiff.  Ronald Losch and Mark Meyer represented Defendant.  The Court
     received post-trial briefing on August 16, September 9 and September 16, 2011.
23
24          At trial, Plaintiff contended that Defendant caused the collision because he violated the
25   Inland Navigational Rules, 33 U.S.C. § 2001, et seq., by, among other things, failing to maintain a
26   proper look-out on Inkatu as required by Rule 5, and failing to yield the right-of-way to Quark
27   Speed, as required by Rule 12.  Plaintiff argued that it incurred $83,344.79 in damages caused by
28   Defendant's negligence.  Defendant contended that Gilbert Mitchell, the captain of Quark Speed,
     caused the collision between the vessels by turning into the path of Inkatu at the last minute even
     though he had not determined that the vessels were on a collision course.

United States District Court
For the Northern District of California

As described in more detail below, the Court finds that the evidence demonstrates that this accident was relatively simple.  Defendant's failure to look-out and to yield as the give way vessel, as opined by Plaintiff's expert John Denham, caused the collision and Defendant did not rebut the presumption that these violations of the Rules of the Road caused the accident.  The Court notes that Defendant admits that it violated Rule 5, which requires all vessels to maintain a proper look-out.  Even if Plaintiff also violated Rules of the Road, the duty to look-out is of the highest importance.

The Court credits the testimony of Mr. Mitchell that he believed the vessels were on a collision course and that as an experienced sailor, he did not need to confirm that belief by using radar or any other device.  The Court was not persuaded by Defendant's expert, Susan Arms, who testified that the boats were not on a collision course, although her qualifications were impressive.  Further, the Court credits Mr. Mitchell's testimony that the boats were only seventy-five to one hundred feet apart when he realized that Inkatu did not have a look-out and thus likely did not know that Quark Speed was in front of it.  Mr. Mitchell's testimony was credible that he turned Quark Speed to the right at the last minute to avoid a collision with Inkatu.  The Court also credits Mr. Denham's testimony that Mr. Mitchell took appropriate action to turn into the wind given the lack of a look-out on Inkatu.  Thus, Mr. Mitchell acted reasonably in light of the all the circumstances before the collision.  Perfection is not required.

With respect to damages, the Court credits the testimony of Mr. Olsson, the President and part-owner of Plaintiff R.C. Fisher, that Plaintiff paid $29,507.78 to Nelson's Marine for some of the repairs to Quark Speed, and that Nelson's Marine invoiced $78,351.32 for all repairs.  However, the Court was troubled by the evidence that not all of the items listed on the invoices were actually used and that improvements were made to Quark Speed in lieu of repairing and replacing items allegedly damaged by the collision.  Finally, the Court credits the testimony and evidence regarding the salvage claim.

Accordingly, the Court finds that Plaintiff is entitled to judgment in the amount of $63,775.34 against Defendant.  The Court makes the following findings of fact and conclusions of law.

**United States District Court**
**For the Northern District of California**

**Findings of Fact[1]**

Quark Speed is a Catalina 36, a 36-foot long sloop sailing vessel.  Trial Transcript (Tr.) at 13.  Glibert Mitchell, Wayne Martin and David Marshburn are partners in Quark Speed Partners, and co-own Quark Speed.  Tr. at 12-13.

Inkatu is a Tayana 37 cruising sailing vessel.  Tr. at 213.  Defendant Charles Cartwright owns Inkatu.  Tr. at 213.

On June 24, 2007, boat traffic in the San Francisco Bay was moderate to heavy.  Tr. at 24-25. The wind was blowing from the west at about fifteen to twenty knots.  Tr. at 14, 16, 23, 191. On that day, Mr. Mitchell was sailing Quark Speed in the San Francisco Bay from the Oakland Yacht Club to the San Francisco Yacht Club in Tiburon.  Tr. at 19, 21.  Mr. Mitchell has over fifty years of sailing experience.  Tr. at 13.  He raced sail boats off and on for ten to fifteen years.  Tr. at 13.  He crewed different boats in the San Francisco Bay.  Tr. at 14.  Mr. Mitchell has taken courses in navigation and seamanship.  Tr. at 14.  He has also studied books on sailing, including Chapman's, which addresses the Rules of the Road.  Tr. at 14.  Also on board Quark Speed were Paul Blaise, his then-twenty-three year old daughter, Crystal, and his then-fourteen year old son, Skyler.  Tr. 16, 73.  The Blaise family had no sailing experience.  Tr. at 17.

When Quark Speed could not dock at the San Francisco Yacht Club, Mr. Mitchell decided to head back to the Oakland Yacht Club.  Tr. at 21-22.  Quark Speed was then traveling in a south-south-easterly direction on a starboard tack with her sails at beam reach at about five or six knots. Tr. at 23-24, 32.  Quark Speed was sailing on a fairly steady course.  Tr. at 24.  Mr. Mitchell intended to sail Quark Speed along the shoreline of the City of San Francisco.  Tr. at 23-24, 32.

At the same time, Defendant was sailing the Inkatu from an area south-east of San Francisco to Sausalito.  Tr at 38, 189, 190-191.  Also on board Inkatu were Defendant's then-wife Gisela, who did not have much sailing experience, and Gabe Turco, an experienced sailor.  Tr. at 187-88. Defendant was heading on a steady course toward the north-west on a port tack at about five knots. Tr. at 38, 189-90.  The front sail of Inkatu blocked Defendant's view of vessels approaching from

---

[1]     The Court notes that its conclusions of law may contain findings of fact and its findings of fact may contain conclusions of law.

1    the north-north-west.  Tr. at 194-95.  Defendant had instructed his passengers to look out and keep

2    him informed of any oncoming vessels.  Tr. at 193, 214.  No one informed Defendant of any

3    approaching vessels.  Tr. at 194, 224.

4         Mr. Mitchell first spotted Inkatu when it was approximately 150 yards away.  Tr. at 24.

5    Although Mr. Blaise testified that Quark Speed's passengers first noticed Inkatu when it was about

6    200 - 300 yards away (Tr. at 75), the Court credits Mr. Mitchell's testimony on this point, given the

7    general difficulty in judging distances over water, Mr. Mitchell's extensive sailing experience and

8    Mr. Blaise's lack of sailing experience.  Mr. Mitchell could see Inkatu approaching from the port

9    side of Quark Speed.  Tr. at 29.  Mr. Mitchell told Crystal Blaise that the approaching boat was on a

10   port tack and was required to fall off the wind to miss Quark Speed.  Tr. at 29.  At that time, Mr.

11   Mitchell believed that Inkatu was on a collision course with Quark Speed.  Tr. at 33.  Although Mr.

12   Mitchell did not use any particular device or technique to determine whether the vessels were

13   actually on a collision course (Tr. at 57, 59-60), Defendant's expert, Susan Arms, testified that "very

14   good sailors" can visually determine when vessels are on a collision course.  Tr. at 388.  There was

15   no evidence demonstrating that Mr. Mitchell was anything but a very good sailor with many years of

16   sailing experience.

17        When Quark Speed was about seventy-five to one hundred feet away from Inkatu, Mr.

18   Mitchell realized that he could not see anyone on board the Inkatu, which indicated that Inkatu was

19   not aware of Quark Speed's presence.  Tr. at 30-31.  At that point, Mr. Mitchell took steps to avoid a

20   collision by turning into the wind.  Tr. at 31-32.  Mr. Mitchell trimmed his sails to maintain his

21   speed and was not trying to slow down by turning into the wind, but was trying to alter course to

22   avoid a collision.  Tr. at 31-32.

23        Defendant first saw Quark Speed when it was about thirty feet away.  Tr. at 193.  He was

24   unable to determine which direction Quark Speed had come from and initially believed it had

25   overtaken Inkatu.  Tr. at 196-97.  Defendant assumes that Quark Speed was in Inkatu's blindspot.

26   Tr. at 193.  Inkatu did not change course until the moment before the collision, when Defendant

27   turned hard to the right.  Tr. at 193-94.

28        Approximately 200 yards west of Alcatraz Island, Intaku struck Quark Speed portside, about

amidships.  Tr. at 36; Ex. 3.  Its wooden bowsprit came up over Quark Speed's rail and then swept down, knocking safety lines down, knocking the helm of Quark Speed out of the deck, and knocking Mr. Mitchell and Skyler Blaise into the water.  Tr. at 36.  Mr. Mitchell was rescued by a passing vessel, Serendipity, and was taken to the hospital.  Tr. at 36-37.  Paul and Crystal Blaise remained aboard Quark Speed, which had no controls and seemed to be going in circles towards Alcatraz.  Tr. at 78.  Crystal attempted to lower the main sail, but she was unsuccessful.  Tr. at 79.  A tow vessel threw a line to Quark Speed and snagged its bow.  Tr. at 79, 202.  Because Quark Speed's sails were up, the tow vessel had difficulty towing it.  Tr. at 79.

Officer Latus of the San Francisco Police Department was quickly on the scene and gave Crystal instructions on lowering Quark Speed's sail, which she was able to do.  Tr. at 79.  Quark Speed was then towed toward the Oakland Estuary.  Tr. at 116.  Quark Speed was eventually towed to Nelson's Marine in Alameda.  Officer Latus, along with the crew of Inkatu, pulled Skyler Blaise from the water.  Tr. at 200-202.  After all of the other vessels left the scene, Defendant determined that Inkatu suffered damage that put its mast under stress and returned to its home port.  Tr. at 204.  Defendant then attempted to report the accident to various agencies.  Tr. at 204-05.

Plaintiff is an insurance broker that obtained insurance from Markel Insurance for Quark Speed prior to the accident.  Tr. at 167.  Due to a problem with coverage, Plaintiff directly paid for a portion of the Quark Speed repairs, and its malpractice insurer paid the balance.  Tr. at 168, 170.  Plaintiff paid for repairs by checks in the total amount of $29,507.78.  Tr. at 177.

Nelson's Marine is engaged in the business of boat repair, storage and yacht sales.  Tr. at 395.  Nelson's Marine made repairs to Quark Speed in connection with the June 24, 2007 collision.  Tr. at 396.  Mr. Nelson estimated the cost of repairs, oversaw the progress of the job, prepared work orders and invoices, and met with the Quark Speed owners.  Tr. at 397.  All of Nelson Marine's invoices were paid in connection with Quark Speed's repairs.  Tr. at 408.  Mr. Nelson was paid $78,351.32 for Quark Speed's repairs.  Tr. at 446.  Mr. Nelson originally prepared a work order in the amount of $49,714.95, and then additional damage was found that is reflected in later work orders.  Tr. at 399-400; Ex. 4-11.  Mr. Nelson found that some electronics listed in the invoices were damaged and needed replacement because they were not interchangeable with new items available

United States District Court
For the Northern District of California

through the market.  Tr. at 402.  The wind, speed, and depth systems needed replacement because they were damaged and required replacement of the entire unit.  Tr. at 403.  Mr. Nelson also found the autopilot control mechanism was broken from the helm station, and the gauges and wires were either broken, separated, or damaged.  Tr. at 403.  The whole helm had been ripped loose from the base of the cockpit floor.  Tr. at 403.  Mr. Nelson also found the mast's wiring was damaged, and suspected that one of the spreaders had also been damaged and that the mast had been bent.  Tr. at 403-04.  Tearing the mast down, rebuilding it, and putting it back together would have cost more than buying and installing a new mast package.  Tr. at 403-04.  Although the mast was suspected of being damaged, the owners decided not to replace the mast, and opted for a much less expensive paint job and repair to the mast, including replacement of the standing rigging.  Tr. at 404, 419. Subsequently, the owners also pointed out damage to the sails.  Tr. at 416.  Rather than repair the sail, the owners opted for installation of a thirty-six inch television on Quark Speed.  Tr. at 416-17, 429-30.  Mr. Nelson found the stern rail wire and stanchions were damaged, he believed due to the collision.  Tr. at 422.  Mr. Nelson also found additional damage to the lifelines, the hullside, and the rub rail and jib track.  Tr. at 422, 425-26.  While Mr. Nelson appeared to be telling the truth as he knew it, and his testimony generally was proper lay testimony, his testimony regarding the extent of the repairs that were required as a result of the collision, however, is not entirely reliable because he did not inspect Quark Speed prior to the collision and therefore did not know its status prior to the collision. Further, Mr. Nelson testified that even though some parts of the boat appeared to be damaged, the Quark Speed owners did not fix them, but instead opted to upgrade some of the non-damaged electronic equipment on the boat.  Tr. at 419.

Inkatu sustained damage that was repaired.  Tr. at 205-07.  It is undisputed that the reasonable cost of the repair was $17,128.85.  Tr. at 241-43, 244.

Christopher Nye, a marine surveyor with Davis & Company, was hired by Allstate Insurance to inspect Quark Speed in 2007.  Tr. at 246.  Mr. Nye stated in his report that it was possible for further damage to be discovered during the repairs to Quark Speed.  Tr. at 290.  Mr. Nye prepared another report on January 4, 2008.  Tr. at 291; Ex. H.  In that report, he stated that any damage not listed on his first estimate would need to be physically inspected and confirmed as relating to the

6

United States District Court
For the Northern District of California

1  June 24, 2007 collision. Tr. at 296-97. No one informed Mr. Nye that there was additional damage

2  to Quark Speed. Tr. at 299. Allstate did not authorize Mr. Nye to inspect Quark Speed again until

3  October 17, 2008, at which time most of the repairs had already been completed. Tr. at 297, 300.

4  Mr. Nye did not have any direct contact with Nelson's Marine regarding additional damage. Tr. at

5  300.

6        Officer Latus prepared a police report in connection with the collision. Tr. at 89; Ex. 3.

7  Officer Latus has extensive training in investigating, reconstructing and reporting on boating

8  accidents. Tr. at 92. He reconstructed the collision between Quark Speed and Inkatu based on

9  witness and party statements and the damage to the vessels. Tr. at 97. The police report states that

10 the cockpit area on the port side of Quark Speed was damaged, and that the damage went back

11 towards the stern. Tr. at 97. Officer Latus concluded that Quark Speed had the right of way based

12 on his inspection of the damage, the parties' statements and Defendant's statement that he was on a

13 port tack. Tr. at 97-98. Officer Latus did not believe that he was getting an accurate version of

14 events from Defendant and his former wife, but did believe that the account of events from

15 individuals on Quark Speed was credible. Tr. at 99.

16 **Conclusions of Law**

17 **1.        Liability**

18        The Rules of the Road apply to all vessels on U.S. inland waters. See 33 U.S.C. § 2001(a).

19 "Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the

20 consequences of any neglect to comply with these Rules or of the neglect of any precaution which

21 may be required by the ordinary practice of seamen, or by the special circumstances of the case." 33

22 U.S.C. § 2002. Any person who undertakes navigation of inland waters is charged with knowledge

23 of Inland Navigation Rules and is under a mandatory duty to follow them. See In re Am. Milling

24 Co., 270 F. Supp. 2d 1068 (E.D. Mo. 2003).

25        Under the Pennsylvania Rule, if a vessel involved in a collision was in actual violation of a

26 statutory or regulatory rule intended to prevent collisions, the burden shifts to the violating vessel to

27 show that its statutory fault was not a contributing cause of the accident. The Pennsylvania, 86 U.S.

28 (19 Wall.) 125, 136, 22 L.Ed. 148 (1873); see also Crowley Marine Servs. v. Maritrans, Inc., 447

1   F.3d 719, 724 (9th Cir. 2006).  The Fifth Circuit has stated:

2   > Named for the case in which it was laid down, The <u>Pennsylvania</u> rule states that
    > when, at the time of a collision, a ship

3
4   >> is in actual violation of a statutory rule intended to prevent collisions, it is no
    >> more than a reasonable presumption that the fault, if not the sole cause, was at
    >> least a contributory cause of the disaster. In such a case, the burden rests upon
5   >> the ship of showing not merely that her fault might not have been one of the
    >> causes, or that it probably was not, but that it could not have been.

6
7   > 86 U.S. at 136 (emphasis added). The rule allocates the burden of proof, transferring
    > it to the party in violation of a statute or regulation. If that party is to escape liability
    > for the loss, it must prove not just that its violation probably was not, but in fact could
8   > not have been a proximate cause of the collision. See <u>Candies Towing Co., Inc. v. M/V B & C
    > ESERMAN</u>, 673 F.2d 91, 93 (5th Cir.1982) (the rule of <u>The Pennsylvania</u>
9   > "constitutes an evidentiary rule reversing the burden of proof"); Grant Gilmore &
    > Charles L. Black, <u>The Law of Admiralty</u> § 7-5 (2d ed. 1975).

10

11  <u>Pennzoil Producing Co. v. Offshore Exp., Inc.</u>, 943 F.2d 1465, 1471-72 (5th Cir. 1991); <u>MacDonald

12  v. Kahikolu, Ltd</u>, 581 F.3d 970, 973 (9th Cir. 2009) ("Under the Rule, if a vessel involved in an

13  accident violated a statute or regulation intended to prevent such an incident, it is presumed that the

14  ship owner was at fault, and the burden of proving causation shifts to the ship owner.").  The burden

15  imposed by the <u>Pennsylvania</u> rule has been described as "'difficult, if not impossible,'" to discharge.

16  <u>Trinidad Corp. v. S.S. Keiyoh Maru</u>, 845 F.2d 818, 825 (9th Cir.1988) (quoting <u>Ishizaki Kisen Co.

17  v. United States</u>, 510 F.2d 875, 879 (9th Cir.1975)).  Nevertheless, the presumption is rebutted

18  where the defendant shows by clear and convincing evidence that the violation could not reasonably

19  be held to have been a proximate cause of the injury.  <u>Id.</u> at 824 (quoting <u>States S.S. Co. v.

20  Permanente S.S. Corp.</u>, 231 F.2d 82, 87 (9th Cir.1956)).

21      Regarding the application of the <u>Pennsylvania</u> rule, the Ninth Circuit has stated:

22  > All courts have consistently required that there be a threshold causal connection
    > between the violation and the injury before the Rule will apply. See, e.g., <u>Mathes</u>,
23  > 774 F.2d at 983; <u>Wills</u>, 379 F.3d at 44; <u>Seaboard Tug & Barge v. Rederi AB/Disa</u>,
    > 213 F.2d 772, 775 (1st Cir.1954); <u>Horton</u>, 70 P.3d at 407. In part, this has meant that
24  > the injury must be of the kind intended to be prevented by the statute or regulation
    > that the defendant violated. See <u>Wills</u>, 379 F.3d at 43 (holding that application of the
25  > Rule is "limited to the violation of a statute intended to prevent the catastrophe which
    > actually transpired"); <u>Nautilus Motor Tanker Co.</u>, 85 F.3d at 114 (requiring three
26  > elements to be met for the Rule to apply: "(1) proof by a preponderance of the
    > evidence of violation of a statute or regulation that imposes a mandatory duty; (2) the
27  > statute or regulation must involve marine safety or navigation; and (3) the injury
    > suffered must be of a nature that the statute or regulation was intended to prevent");
28  > <u>Folkstone Mar., Ltd. v. CSX Corp.</u>, 64 F.3d 1037, 1047 (7th Cir.1995) (adopting
    > same); <u>Nassau Marine Corp.</u>, 778 F.2d at 1116 (stating that the Rule "generally has

1   been limited, at least in cases not involving collisions and allisions, to violations of
2   statutes intended to prevent the injury that actually occurred").

3   MacDonald, 581 F.3d at 975. The Ninth Circuit set out the law governing collisions at sea:

4       Under admiralty law, if a ship is in violation of an applicable statutory duty at the
        time of a collision, there is a presumption that the violation contributed to the
5       accident. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 136, 22 L.Ed. 148 (1873),
        overruled on other grounds in United States v. Reliable Transfer Co., Inc., 421 U.S.
6       397, 411, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). This presumption may be rebutted
        by a showing that the statutory violation "could not reasonably be held to have been a
7       proximate cause of the collision." Churchill v. The F/V Fjord, 892 F.2d 763, 770 (9th
        Cir.1988) (quoting Pac. Tow Boat Co. v. States Marine Corp., 276 F.2d 745, 749 (9th
8       Cir.1960)) (internal quotation marks omitted). Where both parties to a collision share
        in the fault, "liability for such damage is to be allocated among the parties
9       proportionately to the comparative degree of their fault." Reliable Transfer, 421 U.S.
        at 411, 95 S.Ct. 1708.
10

11  Crowley I, 447 F.3d at 724-25; id. n. 7 (emphasizing flexibility and adaptability of the comparativ

12  fault standard); see also Crowley II, 530 F.3d at n.4 ("This Pennsylvania-presumption goes only to

13  causation and has no bearing on the district court's determination of liability.") (internal citations

14  omitted); United States v. Reliable Transfer, 421 U.S. 397, 411 (1975) (holding that liability for

15  damage in ship collision cases is to be allocated among the parties proportionately to the

16  comparative degree of their fault, and to be allocated equally only when the parties are equally at

17  fault or when it is  not possible fairly to measure the comparative degree of their fault).  Further, the

18  Crowley I court stated:

19      We leave to the district court to factor and weigh relative liability in a fault allocation
        analysis. . . . The blameworthiness of each party's conduct would ultimately depend
20      not only on the rules that each party violated but on whether those violations actually
        caused the collision, considering all the facts of the case.
21

22  Crowley I, 447 F.3d at 727-28.  "Comparative fault requires a district court to undertake an

23  individualized evaluation of each collision and to consider and compare the 'fault' of each party,

24  where 'fault' is defined as 'blameworthy conduct which contributes to the proximate cause of the

25  loss or injury.'"  Crowley II, 530 F.3d at 1174 (quoting Pan-Alaska Fisheries, Inc. v. Marine Constr.

26  & Design Co., 565 F.2d 1129, 1139 (9th Cir.1977)).  The Crowley II court rejected the argument

27  that violation of any one specific rule (there, the right-of-way rule) creates automatic liability.

28  Crowley II, 530 F.3d at 1175 ("We decline to adopt Crowley's proposed rule because it would

United States District Court
For the Northern District of California

1    contravene the purpose of the comparative fault standard established in <u>Reliable Transfer</u> - namely,

2    to allocate fault according to the blameworthiness of each party-particularly in cases, like this one,

3    where the district court determines that the conduct of the party not in violation of Rule 13(a) was

4    the primary cause of the collision."); <u>see also</u> The International Regulations for Preventing

5    Collisions at Sea (COLREGS) Rule 13(a) (providing that "any vessel overtaking any other shall

6    keep out of the way of the vessel being overtaken.").

7        After carefully reviewing each parties' individual fault, however, the Court concludes that

8    the accident in this case was simple and was proximately caused by Inkatu's failure to keep a proper

9    look-out.  Defendant has not provided clear and convincing evidence to the contrary.  Thus, the

10   Court declines to allocate any blame to Quark Speed for the accident.  Further, even if Quark Speed

11   did not perfectly follow each and every Rule of the Road on June 24, 2007, any comparatively minor

12   misstep by Mr. Mitchell, a very experienced sailor, can be attributed to the stressful need to act very

13   quickly to try to avoid a collision because of the dangerous emergency situation caused by

14   Defendant's clear and serious violation of the Rules of the Road.

15        The evidence showed that Inkatu violated Rule 5, which requires every vessel to maintain a

16   proper look-out by sight and hearing.  <u>See</u> 33 U.S.C. § 2005 ("Every vessel shall at all times

17   maintain a proper look-out by sight and hearing as well as all available means appropriate in the

18   prevailing circumstances and provisions so as to make a full appraisal of the situation and of the risk

19   of collision.").  Rule 5 is of utmost importance and "[i]t is the duty of all courts charged with the

20   administration of this branch of our jurisprudence to give the fullest effect whenever the

21   circumstances are such as to call for its application." <u>Tug Ocean Prince, Inc. v. United States</u>, 584

22   F.2d 1151, 1159 (2d Cir. 1978).  "Every doubt as to the performance of the duty, and the effect of

23   non-performance, should be resolved against the vessel sought to be inculpated until she vindicates

24   herself by testimony conclusive to the contrary." <u>Id.</u>  Defendant did not see Quark Speed

25   approaching because despite instructions to do so, the crew of Inkatu did not keep a look-out and

26   inform Defendant of any oncoming traffic.  In addition, the Court credits Mr. Denham's expert

27   testimony that Inkatu violated Rule 5.  Thus, as conceded by Defendant in its post-trial briefing,

28   Inkatu failed to comply with Rule 5 to have a look-out.  <u>See</u> Def.'s Aug. 16, 2011 Post-Trial Brief at

13.

Further, because Inkatu failed to look-out, Inkatu also violated Rule 12(a), which states:

When two sailing vessels are approaching one another, so as to involve risk of collision, one of them shall keep out of the way of the other as follows: (i) when each has the wind on a different side, the vessel which has the wind on the port side shall keep out of the way of the other. . . .

33 U.S.C. § 2012(a).  The evidence was undisputed that Inkatu was on a port tack and Quark Speed was on a starboard tack.  Therefore, it was Inkatu's obligation to give way to Quark Speed (Tr. at 381), as opined by Mr. Denham, which it did not do in time to avoid a collision.

Quark Speed, as the stand on vessel, remained "fully obliged to comply with the Rules of this part when the two vessels are approaching one another so as to involve risk of collision."  33 U.S.C. § 2008(f)(iii); see also Crowley, 510 F.3d at 1175 ("all ships must exercise requisite caution regardless of their statutory [right-of-way] status.").  The evidence shows that Quark Speed complied with the Rules by maintaining its course and speed until it became clear that Inkatu was not going to alter its course so as to avoid a collision.  See 33 U.S.C. § 2017(a) ("(a) Stand-on vessel to keep course and speed; action allowed when give-way vessel fails to take appropriate action (i) Where one of two vessels is to keep out of the way, the other shall keep her course and speed. (ii) The latter vessel may, however, take action to avoid collision by her maneuver alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules.").  The Court is not persuaded that a collision would not have occurred but for Quark Speed's turn into the wind.

Although Defendant's expert, Susan Arms, was a generally credible expert, the Court is not persuaded by her opinion that Quark Speed's change in course caused the collision.  First, Ms. Arms' opinion is based on assumptions that are disputed.  For example, Ms. Arms stated in her report that "if the alteration of course was as little as ten degrees and occurred when the boats were 75 to 100 *yards* apart, and a collision occurred, it does not compute that they could have been on a collision course" before Quark Speed altered course.  Ex. Q at 3 (emphasis added).  However, Mr. Mitchell testified at trial that he started coming up into the wind when Inkatu was seventy-five to one hundred *feet* away.  Tr. at 30-31.  Moreover, according to witness statements in the police report, Quark Speed did not turn until it was about forty-five feet away from Inkatu.  Ex. B at 5.  If

11

**United States District Court**
For the Northern District of California

1  the Quark Speed did not turn until it was about forty-five feet away from Intaku, there would only be

2  approximately two seconds before impact, which was unlikely to be enough for Quark Speed to

3  complete its turn, let alone to have the stern leave the old course.  Even if the vessels were not on a

4  collision course when Mr. Mitchell altered his course, they were very close to a collision course.  If

5  the Quark Speed's stern did not leave the old course, collision would have occurred whether or not

6  Mr. Mitchell turned the boat.  Further, even if Mr. Mitchell managed to completely turn the sail from

7  close reach to close haul in less than a second, the boat would still take a couple of seconds to

8  respond and for the bow to actually turn.  Given that the Court concludes that the boats were closer

9  than Ms. Arms opined in her report, it was even less likely for Quark Speed to have completed its

10 turn or for its stern to have left its old course within a few seconds before impact.  Even assuming

11 that the boats would have missed each other by a very small margin had they stayed course, Mr.

12 Mitchell acted reasonably in taking evasive maneuvers even if those maneuvers may not have been

13 correct in retrospect.  See City of Chicago v. M/V Morgan, 375 F.3d 563, 577 (7th Cir. 2004) (". . .

14 where one ship has, by wrong maneuvers, placed another ship in a position of extreme danger, that

15 other ship will not be held to blame if she has done something wrong, and has not been maneuvered

16 with perfect skill and presence of mind.").  Thus, Quark Speed's turn upwind was not the cause of

17 the collision.

18     Quark Speed's violation of Rule 34, if any, was not the cause of the collision.  Rule 34 states

19 in relevant part:

20     When vessels in sight of one another are approaching each other and from any cause
       either vessel fails to understand the intentions or actions of the other, or is in doubt
21     whether sufficient action is being taken by the other to avoid collision, the vessel in
       doubt shall immediately indicate such doubt by giving at least five short and rapid
22     blasts on the whistle. This signal may be supplemented by a light signal of at least
       five short and rapid flashes.
23

24 33 U.S.C. § 2034(d).  When Mr. Mitchell first saw Inkatu at 150 yards away, it was not clear to him

25 that Inkatu did not have a look-out and would not alter its course to avoid collision.  When it became

26 clear to Mr. Mitchell at 75 feet away that Inkatu was not going to alter its course, there may not have

27 been time for him to signal Inkatu with whistle blasts given that Quark Speed's horn was not within

28 reach of the helm.  However, even if Mr. Mitchell had signaled Inkatu by whistle or light when he

realized, at 75-100 feet away, that Inkatu was not going to alter its course, there was no persuasive

United States District Court
For the Northern District of California

1    evidence that Inkatu would have been able to maneuver quickly enough to avoid the collision.

2         Ms. Arms testified that Quark Speed could have slowed down when it became clear that

3    Inkatu was not going to change course, and therefore was in violation of Rule 8(e).  Rule 8(e) states:

4         If necessary to avoid collision or allow more time to assess the situation, a vessel
          shall slacken her speed or take all way off by stopping or reversing her means of
5         propulsion.

6    33 U.S.C. § 2008(e).  The evidence shows that Mr. Mitchell did not intentionally slow Quark Speed,

7    but turned into the wind while trimming the sails to attempt to maintain his speed.  However, there is

8    no evidence that, at the point at which Mr. Mitchell realized that Inkatu would not change course,

9    Mr. Mitchell could have avoided a collision by slowing down.

10        The Court concludes that Defendant has not proven by clear and convincing evidence that

11   Inkatu's violation of Rule 5 could not reasonably be held to be a proximate cause of this accident.

12   Thus, Defendant is liable for the collision.  The Court does not conclude that Quark Speed's

13   violations of the Rules of the Road, if any, contributed to the accident.  Instead, the Court finds that

14   Mr. Mitchell acted as well as could be expected under the exigent circumstances created by

15   Defendant.  City of Chicago, 375 F.3d at 577.  The Court declines to allocate any liability to Quark

16   Speed.

17   **2.    Damages**

18        **A.    Compensatory damages**

19        "'The purpose of compensatory damages ... is to place the injured person as nearly as

20   possible in the condition he would have occupied if the wrong had not occurred.'"  Pizani v. M/V

21   Cotton Blossom, 669 F.2d 1084, 1088 (5th Cir. 1982) (quoting Freeport Sulphur Co. v. S/S

22   Hermosa, 526 F.2d 300, 304 (5th Cir. 1976) and Restatement (Second) of Torts § 903 comment a

23   (1977)).  Further,

24        As corollaries to this general rule, a defendant cannot be held liable for damages that
          he has not been shown to have caused, see, e.g., Winter v. Eon Production, Ltd., 433
25        F.Supp. 742, 746 (E.D.La.1976), or for the cost of repairs that enhance the value of
          the damaged property compared with its pretort condition, see, e.g., Freeport Sulphur
26        Co. v. S/S Hermosa, supra, 526 F.2d at 304, 307; see also Restatement (Second) of
          Torts § 928(a) comment a (1977).

27   Pizani, 669 F.2d at 1088.  When a vessel is damaged in a collision, the amount of recovery depends

28   on whether it is deemed a total, or constructive total, loss or whether its partial damage justifies

13

United States District Court
For the Northern District of California

1   repair.  See Gaines Towing and Transp. Inc. v. Atlantia Tanker Corp. 191 F.3d 633, 635 (5th Cir.

2   1999) (citing 2 Thomas J. Schoenbaum, Admiralty and Maritime Law § 14-6, at 278 (1994)).  A

3   vessel is considered a constructive total loss when the damage is repairable but the cost of repairs

4   exceeds the fair market value of the vessel immediately before the accident.  See id. (citing Ryan

5   Walsh Stevedoring Co. v. James Marine Services, Inc., 792 F.2d 489, 491 (5th Cir.1986)).  When a

6   damaged vessel is not a total loss, the owner is entitled to recover the reasonable cost of repairs

7   necessary to restore it to its pre-accident condition.  See id. (citing The Tug June S v. Bordagain

8   Shipping Co., 418 F.2d 306, 307 (5th Cir.1969) (citing The Baltimore, 8 Wall. 377, 75 U.S. 377, 19

9   L.Ed. 463 (1869))).  Plaintiff bears the burden of proving the fact and amount of damages.  See Faria

10   v. M/V Louise V, 945 F.2d 1142, 1144 (9th Cir. 1991) (citing Pizani, 669 F.2d at 1088).

11       Defendant argues that there is a ceiling on Plaintiff's damages based on the market value of

12   Quark Speed prior to the collision less its salvage value, citing DiMillo v. Sheepscot Pilots, Inc., 870

13   F.2d 746, 752 (1st Cir. 1989).  However, in DiMillo, unlike here, the question was the measure of

14   damages where the boat at issue was a constructive total loss, that is, the cost of repairing the vessel

15   was greater than the value of the vessel before the incident.  The evidence at trial was that the pre-

16   collision value of Quark Speed was $63,250.00.  Ex. G at CART000059.  Defendant's expert, Mr.

17   Nye, who was qualified at trial as an expert in matters of valuation of collision damage, cost of

18   repair, valuation survey, and analysis in general of invoices for repair of vessels, testified that in

19   August 2007, the repair estimate was $49,714.95 (Ex. F at CART000037), indicating that the vessel

20   was not a constructive total loss.  Defendant argues in his post-trial briefing, however, that the vessel

21   was a constructive total loss because Mr. Nelson testified at trial that the ultimate cost of repair was

22   $78,351.32.  As described in detail below, numerous items included in Mr. Nelson's repair estimates

23   as requiring replacement because of damages from the collision were not actually replaced, and

24   therefore cannot reasonably be considered in the overall cost of repair for purposes of determining

25   whether the vessel was a constructive total loss.  As the examples below illustrate, the difference in

26   the value of the vessel and the cost of repair was minimal.  Therefore, the measure of damages used

27   in DiMillo is inapposite.

28       Here, Plaintiff is entitled to damages based on the reasonable cost of repairs caused by the

14

United States District Court
For the Northern District of California

1   collision and necessary to restore Quark Speed to its pre-accident condition.  Plaintiff argues that the

2   reasonable cost of repairs to Quark Speed was the total amount of money paid to Mr. Nelson, which

3   he testified was $78,351.32.[2]  Ex. 6, 7, 9, 10, 11; Tr. at 408, 439.  However, the cases cited by

4   Plaintiff for this argument are inapposite.  Those cases address when a plaintiff may recover lost

5   profits for the time necessary to complete repairs and how to determine lost profits where non-tort

6   related repair or maintenance work is completed at the same time.  Bouchard Transp. Co., Inc. v.

7   Tug Ocean Prince, 691 F.2d 609 (2d Cir. 1982); Skibs A/S Dalfonn v. S/T Alabama, 373 F.2d 101

8   (2d Cir. 1967).  Further, Plaintiff cites Ellerman Lines, Ltd. v. The President Harding, 288 F.2d 288

9   (2d Cir. 1961), but that case stands for the undisputed position that a plaintiff may not seek damages

10  for expenses that could reasonably have been avoided.  Further, even though Mr. Nelson testified as

11  to the damage that he saw to Quark Speed, because he had no knowledge of the pre-accident

12  condition of Quark Speed and because he was not designated as an expert, the Court does not rely on

13  his testimony as to the *cause* of the damage.  Thus, even though he testified that Nelson's Marine

14  completed more than $78,000 in repairs on Quark Speed, there is no evidence that the total amount

15  was caused by the collision or that the total amount was the reasonable cost of repairs caused by the

16  collision.  Thus, Plaintiff has not established that it is entitled to that entire amount in damages.

17      Mr. Nye provided evidence as to damages that were caused by the accident.  Mr. Nye

18  inspected Quark Speed on August 6, 2007.  At that time, he determined that the reasonable cost to

19  repair damage caused by the collision to Quark Speed was $44,052.95.  Ex. F; Tr. at 310-11.  He

20  testified at trial and stated in his report that it was possible that additional damages would be found

21  once repairs began. Tr. at 290; Ex. F at CART 000037 ("It is possible for further damage to be

22  discovered during the repairs to Quark Speed.").  Mr. Nye prepared a subsequent report on January

23  4, 2008 in which he reviewed two additional estimates from Nelson's Marine.  Ex. H.  According to

24  the report, Mr. Nye's company was not provided the opportunity to review the estimates, to inspect

25

26          [2]      At trial, Mr. Olsson, President and part owner of Plaintiff R.C. Fisher, testified that
    Plaintiff paid $29,507.78 to Nelson's Marine for repairs to Quark Speed. Tr. at 177. Mr. Olsson also
27  testified that there were additional checks from Plaintiff's malpractice insurance carrier to Nelson's
    Marine in the amount of $43,073.27, but Mr. Olsson is not a competent witness on amounts paid from
28  the malpractice carrier to Nelson's Marine because he testified that he never saw the checks and was
    not involved in the payments from the malpractice carrier. Tr. at 170-71.

United States District Court
For the Northern District of California

the additional damage or to comment on the two additional estimates.  Ex. H at CART000061; Tr. at 291.  He did not know in January 2008 whether the additional repairs had commenced, and Allstate had not asked him to keep in touch with Nelson's Marine regarding the repairs.  Tr. at 295, 297, 300. In his January 4, 2008 report, Mr. Nye stated that: "Any damage not listed on the first estimate or reported during the 08/06/07 survey of Quark Speed will need to be physically inspected and confirmed as relating to this incident."  Ex. H at CART000064.  Mr. Nye did not inspect Quark Speed again until October 2008, at which time the majority of the repairs had already been completed.  Tr. at 297, 300.  On October 24, 2008, Mr. Nye prepared a report reiterating the amount of costs to repair that was set forth in his initial August 2007 report, and stating that: "We do not recommend any additional damages related to this assignment."  Ex. I at CART000073.  He testified at trial that because he had not been asked to inspect Quark Speed following his initial inspection, his recommendation in the October 24, 2008 report was based on only the damage that he saw on his first inspection.  Tr. at 300-01.  Mr. Nye acknowledged that in some cases, older electronic units may not be compatible with newer replacement units, and that older electronic units that were not damaged might need to be replaced for that reason.  Tr. at 305.

However, there is evidence that Quark Speed's owners did not make some repairs that were attributed to the collision, and that they otherwise had Nelson's Marine make improvements to the boat.  For example, on the November 15, 2007 invoice, Mr. Nelson invoiced materials for "Mast complete package, from Catalina."  Ex. 8.  The amount attributable to these materials was $5,472.40. Id.  Mr. Nelson also included a boom as an item that would be replaced at the cost of $918.05.  Id. However, Mr. Nelson testified at trial that the mast and boom were not replaced, and that Quark Speed's owners opted to paint and repair the mast, and use the money that would have gone to these items on electronics for Quark Speed, some of which were broken and some of which were upgraded.  Tr. at 403-04, 418-19, 440.  Further, there is no evidence that the mast required replacement as a result of the collision, and Mr. Nye testified that he did not observe any damage to the mast.  Tr. at 255.

As another example, on the March 5, 2008 invoice, Mr. Nelson listed: "New main sail, damaged during collision."  Ex. 11.  The amount attributable to the sail was $3,796.00.  Id.

United States District Court
For the Northern District of California

1 However, the sail was only stained, not torn or otherwise damaged, when it was examined at

2 Nelson's Marine, and Plaintiff failed to provide any evidence to support the notion that the collision

3 caused this cosmetic damage.  Tr. at 415.  In any event, the sail was not replaced, and the Quark

4 Speed owners used funds that would have been used for the sail to have a thirty-six inch television

5 installed on Quark Speed.  Tr. at 416-17, 429-30.

6 　　　　Further, on the November 15, 2007 invoice, Mr, Nelson listed an E80 display as an item to

7 be installed on Quark Speed.  Ex. 8.  The amount attributable to the E80 display was $3,414.48.  Id.

8 However, Mr. Nelson testified at trial that the E80 display was not installed, and instead the Quark

9 Speed owners opted to install the thirty-six inch television.  Tr. at 431.

10 　　　　Plaintiff argues that it is entitled to recover from Defendant for replacement costs even if no

11 repairs or only partial repairs are made.  Bleakley Transp. Co. v. Colonial Sand & Stone Co., 245

12 F.2d 576, 578 (2d Cir. 1957) ("The owner of a vessel damaged by the negligence of another is

13 entitled to recover from the wrongdoer the reasonable cost of its restoration to as good condition as

14 before the damage, save only that such expense does not exceed the before-damage value, and this is

15 so even though no repairs, or only partial repairs, are actually made.").  However, Bleakley does not

16 support Plaintiff's position.  In that case, the owner of a vessel was not permitted to recover the cost

17 of replacement when a less expensive repair was made:

18 　　　　　An owner whose boat is damaged by the negligence of another is entitled to have his
　　　　　boat repaired in a way which will not leave her essentially depreciated in her market
19 　　　　　value, or inferior for practical use.  But where an injury can be perfectly repaired for
　　　　　all practical uses at slight expense, but, as in this case, cannot be placed in exactly the
20 　　　　　same condition as new except by taking out and replacing much other good work at a
　　　　　very considerable expense, the court must hesitate in allowing damages on the basis
21 　　　　　of the latter mode of repair, especially where, as in this case, though a long time has
　　　　　elapsed, no such repair has been made. The court could only be warranted in allowing
22 　　　　　for new beams upon very plain and certain proof that the market value of the boat
　　　　　will otherwise be materially and certainly lessened.
23
24 Bleakley, 245 F.2d at 578-79.  Because there is no evidence in this case as to whether the sail and

25 mast were "inferior for practical use," Bleakley does not support Plaintiff's argument that it is

26 entitled to damages in the total amount invoiced by Nelson's Marine, which included items that

27 were not actually replaced, and at least one (the sail) was not harmed by the collision.

　　　　Mr. Nelson testified that there were no unnecessary or excessive repairs to Quark Speed, but
28 his testimony on this point is not reliable given that various items listed on Mr. Nelson's invoices as

United States District Court
For the Northern District of California

1   requiring repair or replacement, ostensibly because of the collision, were not actually repaired or

2   replaced.  The Court is not persuaded that the total amount paid to Nelson's Marine constitutes the

3   reasonable cost of repairs caused by the collision.  In particular, as described above, Mr. Nelson

4   testified as to four items that were essentially improvements to Quark Speed and were not required

5   as a reasonable cost of repair to the boat for damages caused by the accident, and thus are not

6   compensable.  The total amount listed on Mr. Nelson's invoices for those four items was

7   $13,600.94.  With respect to the remainder of the payments to Nelson's Marine, the Court credits

8   Mr. Nelson's testimony as to the reasonable cost of repair to Quark Speed given his years of

9   experience in his profession.  Thus, the Court concludes that Plaintiff have proven a total of

10  $64,750.38 in compensatory damages.

11          **B.      Betterment**

12          The Court concludes that the repairs, in particular the television described above, resulted in

13  unnecessary betterment.  See Pizani, 669 F.2d at 1088 (stating that a defendant cannot be liable for

14  damages that enhance the value of the damaged property beyond its pre-accident condition).

15  Although Mr. Nye opined in his January 4, 2008 report that a decrease of thirty-five percent for

16  betterment should be applied to the final agreed upon value, that estimate was made based only on

17  his initial inspection and invoices from Nelson's Marine.  He had not conducted another inspection

18  of Quark Speed after August 2007 and before the January 2008 report, and during that time, the bulk

19  of the repair work had been done, some of which was different than the work described on the

20  estimates.  Thus, his betterment estimate is inflated.  At the same time, Mr. Nelson testified that

21  some of the electronics on Quark Speed were upgraded and that the owners were "very much into

22  the electrical gadgets on the boat," and the Court concludes that only some of that may have been

23  necessary to obtain comparable equipment.  Tr. at 419.  Accordingly, the Court will apply a decrease

24  of 10% for betterment.  Thus, Plaintiff's compensatory damages are reduced to $58,275.35.

25          **C.      Salvage**

26          The parties also dispute whether Plaintiff is entitled to payment of the salvage claim of

27  $5,500 relating to the tow of Quark Speed from the collision site.  "To constitute salvage of a vessel

28  she must be in impending peril of the sea from which she is rescued by the voluntary efforts of

United States District Court
For the Northern District of California

1   others."  <u>Puget Sound Tug & Barge Co. v. Waterman S.S. Corp.</u>, 98 F. Supp. 123, 127 (N.D. Cal.

2   1951).  "Salvage is 'a reward for perilous services, and ... an inducement to seamen and others to

3   readily engage in such undertakings and assist in saving life and property.'"  <u>Bartholomew v.</u>

4   <u>Crowley Marine Servs., Inc.</u>, 337 F.3d 1083, 1085 (9th Cir. 2003) (quoting <u>The Flottbek</u>, 118 F.

5   954, 959 (9th Cir.1902)).  "That incentive structure is preserved by giving an award only where

6   salvage is successful, and by denying one where the salvors would have been paid in any case."  <u>Id.</u>

7        Here, Plaintiff has provided evidence that Quark Speed was in peril.  The testimony revealed

8   that the only experienced sailor on Quark Speed had been thrown overboard in  the collision and that

9   the collision had torn out the helm station so that Quark Speed was sailing in circles in close

10  proximity to Alcatraz.  Tr. at 78.  The crew members left on Quark Speed had no sailing experience

11  and were unable to bring down the mainsail on their own.  Tr. at 79.  The tow vessel picked up

12  Quark Speed while its sails were still up, and was having trouble towing Quark Speed until a police

13  officer on a different boat instructed Crystal Blaise on taking down the mainsail.  Tr. at 79.

14  Defendant points to Officer Latus' testimony regarding the location of Quark Speed on the bay as

15  indicating that it was not in peril when it was towed.  Ex. 41 (red dot indicating location of Quark

16  Speed).  However, the mark that Officer Latus made on Exhibit 41 is nowhere near the collision site,

17  and even though it may show that Quark Speed was not in imminent peril of colliding with Alcatraz,

18  it does indicate that Quark Speed was adrift and moving fast away from the accident site with

19  inexperienced sailors on board.  Ex. 41.  Plaintiff has shown that Quark Speed was in peril to justify

20  a salvage award.

21        Defendant argues that even if a salvage payment is due, Plaintiff has not shown that the

22  amount was reasonable.  <u>See</u> <u>Gaines Towing</u>, 191 F.3d at 635 (stating that a defendant cannot be

23  held liable for the cost of repairs that enhance the value of the damaged property compared with its

24  pre-accident condition).  Courts use the following criteria to determine whether the amount of a

25  salvage award is appropriate: "(1) the labor expended by the salvors in rendering the salvage

26  services, (2) the promptitude, skill and energy displayed in rendering the service and saving the

27  property, (3) the risk incurred by the salvors in securing the property from its peril, (4) the value of

28  the property saved, (5) the degree of danger from which the property was rescued, and (6) the value

1  of the property employed by the salvors and the danger to which the property was exposed." <u>Saint</u>

2  <u>Paul Marine Transp. Corp. v. Cerro Sales Corp.</u>, 505 F.2d 1115, 1120 (9th Cir. 1974).

3          The evidence regarding the circumstances surrounding the salvage at trial was not extensive.

4  There is no evidence that the tow vessel expended a particularly high level of labor or incurred a

5  particularly high degree of risk or that the tow vessel was exposed to a particularly high level of

6  danger, but there is evidence that the tow vessel was promptly on the scene and was able to get a line

7  on Quark Speed even though the evidence demonstrates that she was sailing in circles near Alcatraz.

8   Further, there is evidence that the tow vessel's salvage claim was initially approximately $30,000 to

9  $36,000, but was negotiated down to $5,500. Tr. at 175.  Accordingly, the relatively modest sum of

10  $5,500 for the salvage claim is reasonable.

11  **Conclusion**

12          Accordingly, the Court concludes that Defendant has failed to rebut the presumption that it

13  caused the collision with Quark Speed by failing to look-out and failing to yield to the stand on

14  vessel.  The Court declines to attribute any comparative fault to Quark Speed.  Plaintiff is entitled to

15  damages in the amount of $63,775.34.

16          **IT IS SO ORDERED.**

17  Dated: September 19, 2011

18                                                                   ELIZABETH D. LAPORTE
                                                                    United States Magistrate Judge

19

20

21

22

23

24

25

26

27

28