IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| R.C. FISCHER AND COMPANY,<br><br>        Plaintiff,<br><br>  v.<br><br>CHARLES CARTWRIGHT,<br><br>        Defendant.<br>_____/ | No. C-09-02316 EDL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO AMEND JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO ALTER OR AMEND THE JUDGMENT OR ALTERNATIVELY, FOR A NEW TRIAL** |

      Plaintiff R.C. Fisher and Company brought this action for indemnity against Defendant Charles Cartwright arising from a collision between two sailing vessels, Quark Speed and Inkatu, in the San Francisco Bay on June 24, 2007. Plaintiff was the insurance broker for the owners of Quark Speed that paid for a portion of the repairs to Quark Speed on behalf of Quark Speed's owners. Defendant is the owner of Inkatu. The parties consented to a court trial before a magistrate judge pursuant to 28 U.S.C. § 636(c). This matter was tried to the Court on July 21 and 22, 2011. On September 19, 2011, the Court issued its Findings of Fact and Conclusions of Law, and entered judgment in favor of Plaintiff in the amount of $63,775.34. See Docket Nos. 86, 87.

      On September 29, 2011, Plaintiff filed a motion to amend the judgment to include prejudgment interest and additional damages. Plaintiff seeks an amended judgment in the total amount of $75,067.00. See Declaration of Fateh Sahota (docket no. 100) ¶ 4. On October 11, 2011, Defendant filed a motion to alter or amend the judgment or for a new trial, arguing that the Court erred in its Findings of Fact and Conclusions of Law. On November 15, 2011, the Court held a hearing on the parties' motions. For the reasons stated at the hearing and in this Order, the Court grants in part and denies in part both parties' motions.

**Plaintiff's Motion to Amend**

Plaintiff argues that, pursuant to Federal Rule of Civil Procedure 59(e), the judgment should be amended to add prejudgment interest in the amount of $11,292.33 (see Sahota Decl. (docket no. 100) ¶ 4), and to include the cost of the second E80 navigational display in the amount of $3,414.48.

**A.     Prejudgment interest**

The parties do not dispute that Plaintiff is entitled to prejudgment interest, which was not included in the Court's Findings of Fact and Conclusions of Law. A Rule 59(e) motion is the proper mechanism for bringing the prejudgment issue before the Court. See Osterneck v. Ernst & Whinney, 489 U.S. 169, 176-76 (1989) ("Under these precedents, the Court of Appeals was correct to conclude that a postjudgment motion for discretionary prejudgment interest constitutes a motion to alter or amend the judgment under Rule 59(e).").

Admiralty Local Rule 6.3 states:

> Unless a judge directs otherwise or as provided by statute, prejudgment interest shall be awarded at the rate authorized in 28 U.S.C. § 1961, providing for interest on all judgments.

Admir. L.R. 6-3. 28 U.S.C. § 1961 provides in relevant part:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.

28 U.S.C. § 1961(a). In admiralty, prejudgment interest must be granted unless peculiar circumstances justify its denial; whether the circumstances are sufficient to justify the denial is left to the discretion of the district court. Grace Line, Inc. v. Todd Shipyards Corporation, 500 F.2d 361, 366 (9th Cir. 1974). "[P]rejudgment interest is not allowable when compensation for losses that occurred prior to judgment already has been computed by a method that includes interest at a proper rate from the date of the injury." Columbia Brick Works, Inc. v. Royal Ins. Co. of Am., 768 F.2d 1066, 1068 (9th Cir.1985). A district court has broad discretion in determining the date from which prejudgment interest should run. Id.

Plaintiff originally argued that interest should be calculated from the date of the collision,

2

June 24, 2007, through the date of judgment, September 19, 2011, in an amount that represented the six-month average of the United States Treasury Bills from June 24, 2007 through September 19, 2011. See Middle East Engineering & Dev. Co. v. Arkwright-Boston Mfrs., 675 F. Supp. 855, 859 (S.D. N.Y. 1987) (awarding prejudgment interest to be calculated based on the average interest rate paid on six-month United States Treasury Bills). Middle East, however, does not support Plaintiff's argument. That case is not binding on this Court, and even if it was, Middle East does not analyze the calculation of the interest rate or cite 28 U.S.C. § 1961, nor is it obvious from the case that the interest accrued from the date of the loss or that the issue was even raised or disputed. Rather, the statute provides that the calculation shall be "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961.

Defendant argues that Plaintiff is entitled to prejudgment interest only on the amounts actually paid to repair a boat, and not from the date of the accident. See Stevens v. F/V Bonnie Doon, 655 F.2d 206, 209-10 (9th Cir. 1981) (Bonnie Doon I) (finding that the appellee was not entitled to interest on estimated costs of repair, and stating: "We conclude therefore that appellee is entitled to prejudgment interest only on the approximately $1,787 he actually spent to repair the boat."). But in Stevens v. F/V Bonnie Doon, 731 F.2d 1433, 1438 (9th Cir. 1984) (Bonnie Doon II), the court stated that prejudgment interest in Bonnie Doon I was awarded from the date of the accident and only for money actually spent. Further, "prejudgment interest on money not spent is inappropriate when the injured party recovers for loss of use. . . . Generally, the injured party may claim loss of use or interest, but not both." Bonnie Doon II, 731 F.2d at 1437 ; see also United States v. Peavey Barge Line, 748 F.2d 395, 402 (7th Cir.1984) ("[P]rejudgment interest should not be awarded before the injured party pays for the repairs if damages include both demurrage costs and repair costs"). Here, there was no claim for loss of use, so an award of interest from the date of the accident is proper.

The Court is not convinced by Defendant's argument that interest should be calculated based on the formula adopted in Schramm v. CNA Fin. Corp. Insured Group Ben. Program, 718 F. Supp. 2d 1151 (N.D. Cal. 2010), which was an ERISA benefits case. See Schramm, 718 F. Supp. 2d at

3

1160 ("Plaintiff is due interest equivalent to that which would have accrued if she had invested her benefits at a rate equal to the weekly average 1-year constant maturity Treasury yield on the date the benefits were due to her, and then reinvested the proceeds annually at a rate equal to the weekly average 1-year constant maturity Treasury yield at the time of the reinvestment, up to the date on which Defendant satisfies the judgment."). Defendant has not made a showing that this ERISA calculation applies in the context of this marine accident. In Schramm, the court was concerned with the lost investment potential of the funds from a date certain, not with the issue here of the starting date of the interest calculation. See Schramm, 718 F. Supp. 2d at 1160 ("'. . . pre-judgment interest is intended to cover the lost investment potential of funds to which the plaintiff was entitled, from the time of entitlement to the date of judgment. . . .'") (quoting Nelson v. EG & G Energy Measurements Group, Inc., 37 F.3d 1384, 1391 (9th Cir.1994)).

Further, Columbia Brick Works, Inc. v. Royal Ins. Co. of Am., 768 F.2d 1066, 1068 (9th Cir.1985) is instructive in that it specifically rejected the argument that Defendant makes here, that interest should be calculated as of the time that the injured party paid for repair and replacement parts. The Columbia Brick court determined that the payment of interest was necessary to fully compensate the injured party and that the injured party had not otherwise been compensated for it, and that the interest was not meant to compensate some future injury. The principles from Columbia Brick Works apply here. There has been no showing that Plaintiff was otherwise compensated for the prejudgment interest from the date of the accident. Nor has there been any showing that the interest was meant to compensate for future injury. Thus, interest should be calculated from the date of the accident.

Therefore, Plaintiff's motion to amend the judgment is granted to the extent that Plaintiff seeks prejudgment interest from the date of the accident. Further, prejudgment interest shall be calculated as provided in 28 U.S.C. § 1961. The Court ordered the parties to meet and confer regarding the prejudgment interest calculation based on this accrual date, and to file a proposed order regarding the stipulated amount. On November 22, 2011, Plaintiff filed a declaration of counsel stating that the parties were unable to reach a stipulation on this basic issue, and setting forth Plaintiff's position on the applicable rate. On November 28, 2011, Defendant filed a letter setting

4

1  forth its position on prejudgment interest.  The parties dispute whether the applicable interest rate is
2  the rate equal to the weekly average one-year constant maturity Treasury yield, as published by the
3  Board of Governors of the Federal Reserve System, for the calendar week immediately preceding
4  the date of the collision (June 24, 2007), as argued by Plaintiff, or immediately preceding the date of
5  the judgment (September 19, 2011), as argued by Defendant.

6  Under federal law, the rate of prejudgment interest is the Treasury Bill rate as defined in 28
7  U.S.C. § 1961 unless the district court finds on substantial evidence that a different prejudgment
8  interest rate is appropriate.  See, e.g., Blanton v. Anzalone, 813 F.2d 1574, 1576 (9th Cir.1987).  The
9  Ninth Circuit has not established a bright-line rule as to what date the Court should look to in setting
10 the applicable prejudgment interest rate pursuant to § 1961.  Compare, e.g., Saavedra v. Korean
11 Airlines, 93 F.3d 547, 555 (9th Cir. 1996) (affirming the district court's use of the rate of equal to
12 the weekly average one-year constant maturity Treasury yield for the calendar week preceding the
13 date of judgment for the applicable prejudgment interest rate as not an abuse of discretion and
14 consistent with 28 U.S.C. § 1961); with, e.g., United States v. Gordon, 393 F.3d 1044, 1058 (9th Cir.
15 2004) (affirming earlier ruling in Blanton v. Anzalone, 760 F.2d 989, 992-93 (9th Cir. 1985) that the
16 applicable prejudgment interest rate is the one in effect immediately prior to the wrongful conduct).
17 In this case, the parties have proposed two different dates for setting the applicable prejudgment
18 interest rate.  Having reviewed the equities, the Court adopts a prejudgment interest rate as stated in
19 the literal wording of § 1961, that is, the applicable interest rate here is the rate equal to the weekly
20 average one-year constant maturity Treasury yield, as published by the Board of Governors of the
21 Federal Reserve System, for the calendar week immediately preceding the date of the judgment.
22 Substantial evidence does not support application in this case of a rate other than that set forth in §
23 1961.  Thus, the parties are ordered to meet and confer again following issuance of this Order to
24 agree on the amount of prejudgment interest due to Plaintiff (without Defendant waiving its
25 objection to this method of calculation).  No later than December 8, 2011, the parties shall file a
26 stipulation regarding prejudgment interest that includes the total amount of prejudgment interest
27 from the date of the collision to the date of this Order using the rate equal to the weekly average
28 one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal

5

1 Reserve System, for the calendar week ending December 2, 2011, plus a daily rate of interest to
2 apply from the date of this Order through the entry of final judgment, which the Court anticipates
3 entering by December 9, 2011.

**B.     E80 display**

A motion under Rule 59(e) to "alter or amend a judgment" will not be granted "absent highly unusual circumstances," and reconsideration of a judgment or order after its entry by the court "is an extraordinary remedy which should be used sparingly." McDowell v. Calderon, 197 F.3d 1253, 1254 (9th Cir.1999) (citations omitted). The trial court enjoys "considerable discretion" in granting or denying such a motion. Id. There are four grounds upon which a Rule 59(e) motion may be granted: (1) the motion is "necessary to correct manifest errors of law or fact upon which a judgment is based," (2) the moving party presents "newly discovered or previously unavailable evidence," (3) the motion is necessary "to prevent manifest injustice," (4) there is an "intervening change in controlling law." Id.; see also Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 880 (9th Cir.2009) ("[A] motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law.") (quoting 389 Orange St. Partners v. Arnold, 179 F.3d 656, 665 (9th Cir.1999)); Circuit City Stores, Inc. v. Mantor, 417 F.3d 1060, 1064 n. 1 (9th Cir.2005) (holding that relief under Rule 59(e) is appropriate if (1) the court is presented with newly discovered evidence, (2) the court committed clear error or its initial decision was manifestly unjust, or (3) there is intervening change in controlling law) (citations omitted).

Plaintiff argues that to prevent manifest injustice, the judgment should be amended to include the cost of an E80 navigational display because the Court mistakenly deducted the cost of the second E80 display. Plaintiff, however, has not met its burden of showing clear error or manifest injustice to justify additional damages for the E80 display. Mitchell's testimony regarding the displays was ambiguous. He initially testified that before the collision, there were two E80 displays, one at the helm and one below, but he also testified that he was not sure whether there was one mounted on the pedestal prior to the collision. Tr. at 66-67. Nye, the marine surveyor, only

documented one display. Def.'s Ex. I. Thus, Plaintiff's motion to amend the judgment to include the cost of a second E80 navigational display is denied.

**Defendant's Motion to Alter or Amend Judgment, or for a New Trial**

**A.     Legal Standard**

Rule 52(b) states that a party may file a motion to amend the findings no later than 28 days after the entry of judgment. This motion may accompany a motion for a new trial. See Fed. R. Civ. P. 52(b). Motions under Rule 52(b) are primarily designed to correct findings of fact which are central to the ultimate decision; the Rule is not intended to serve as a vehicle for a rehearing. Davis v. Mathews, 450 F.Supp. 308, 318 (E.D.Cal.1978).

Rule 59(a)(2) states that: "After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Absent "other, highly unusual, circumstances," reconsideration pursuant to Rule 59(e) is appropriate only where (1) the court is presented with newly discovered evidence; (2) the court committed clear error or the initial decision was manifestly unjust; or (3) there is an intervening change in controlling law. Sch. Dist. No. 1J, Multnomah Cnty. v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir.1993).

Motions under both Rule 52(b) and Rule 59 are granted in order to correct manifest errors of law or fact or to address newly discovered evidence. See Town House Dep't Stores, Inc. v. Ahn, 2003 WL 881004 (Guam Ter. March 7, 2003) ("a motion to amend under Rule 52(b) is intended "to correct manifest errors of law or fact or, in some limited situations, to present newly discovered evidence") (quoting Fontenot v. Mesa Petroleum Co., 791 F.2d 1207, 1219 (5th Cir.1986)).

**B.     Discussion**

    **1.     The Findings of Fact and Conclusions of Law are amended to deny relief for Defendant's third party complaint against Quark Speed Partners.**

The Court inadvertently failed to address Defendant's third party complaint against Quark Speed Partners. Defendant established damages to Inkatu based on the reasonable cost of repair in the amount of $17,128.85. Def.'s Ex. E. However, the Court determined that Intaku alone proximately caused the collision. Therefore, Defendant takes nothing from its third party complaint against Quark Speed Partners.

7

**2.     The Findings of Fact and Conclusions of Law are amended to dismiss Inkatu.**

Because Inkatu was never served, the action against Inkatu is dismissed.

**3.     Defendant has not shown clear error regarding the Court's description of when Quark Speed turned prior to the collision.**

The Court found that when Quark Speed was 75 to 100 feet from Intaku, Mitchell took steps to avoid a collision and turned into the wind. See Findings of Fact and Conclusions of Law at 4. Defendant argues that this is inconsistent with the evidence that Mitchell turned well prior to the collision: (1) Quark Speed first spotted Inkatu when the boats were a "good distance" apart (Trial Transcript ("Tr."). 24; see also Mitchell Depo. 51); (2) Mitchell testified in deposition that Quark Speed started turning when it was 75 to 100 yards from Inkatu (Mitchell Depo. 55) even though at trial he said 75 to 100 feet (Tr. 31); (3) Quark Speed came to a close haul position (Mitchell Depo. 56; Tr. 53-54); (4) Quark Speed's close haul was "as tight as [Mitchell] could get it (Mitchell Depo 57; see, also Tr. 54); (5) Quark Speed was on a close haul tack for a "couple of minutes," "a minute or two," prior to the collision (Mitchell Depo. 56; Tr. 54); (6) Quark Speed "hardened up" on a new course before the collision (Mitchell Depo. 57); and (7) Mitchell's decision to turn to the right was a "considered and deliberate maneuver" (Mitchell Depo. 58; Tr. 59). Defendant argues that by finding that Quark Speed turned at the last minute, the Court ignored the other evidence of when Mitchell turned to the right. Defendant argues that the Court should credit Mitchell's deposition testimony that he was on a close haul for a minute or two (thus turning when Quark Speed was about 75 to 100 yards away from Inkatu), rather than his trial testimony that he turned when Inkatu was about 75 to 100 feet away because: (1) the deposition was taken closer to the accident; (2) Plaintiff's expert Denham testified that it was difficult to judge distance over water; and (3) the initial headings and the angle of collision are generally undisputed. Defendant argues that the only plausible explanation of Mitchell's trial testimony is that he mis-spoke, especially because he stated at the trial that he wondered what his deposition would say when asked a question about what happened. Tr. 24.

However, Defendant has not shown that the Court's ruling on this issue was clear error. The record contains conflicting evidence, and the Court, as trier of fact, credited some testimony and not other testimony.

**4.     Defendant has not shown clear error regarding the Court's description of**

8

**whether the vessels were on a collision course.**

The Court stated that it "is not persuaded that a collision would not have occurred but for Quark Speed's turn into the wind." Findings of Fact and Conclusions of Law at 11. Defendant argues that this statement is based on the faulty premise that Quark Speed turned into the wind at 75 to100 feet away from Inkatu, and that Quark Speed was not able to complete its turn. Defendant also argues that the Court should not have disregarded the opinions of Defendant's expert Arms regarding whether the boats were on a collision course. Defendant argues that even though Arms' testimony was based on the boats being 75 to 100 yards away, the Court should have accepted the underlying analysis for her opinion that the boats were not on a collision course until Quark Speed turned. The Court, as the trier of fact, weighed the evidence and disagreed with Arms. Defendant has not shown that it was clear error or manifestly unjust to do so.

**5.    The Court amends the Findings of Fact and Conclusions of Law to correct a misstatement regarding a sailing term.**

The Court stated: ". . . even if Mitchell managed to completely turn the sail from close reach to close haul in less than a second, the boat would still take a couple of seconds to respond and for the bow to actually turn." Findings of Fact and Conclusions of Law at 12. Defendant argues that the points of sail terminology do not describe the placement of the sail or the trim of the sail, but the direction of the vessel with respect to the wind. The Court's statement was meant to convey that the boat turned from close reach to close haul. Therefore, the Findings of Fact and Conclusions of Law at page 12 are amended to state: ". . . even if Mitchell managed to completely turn the boat from close reach to close haul in less than a second, the boat would still take a couple of seconds to respond and for the bow to actually turn."

**6.    Defendant has not shown clear error in the Court's finding regarding Rule 7**

Rule 7 requires every vessel to use "all available means appropriate . . . to determine if risk of collision exists," and specifically requires consideration of, among other things, whether "the compass bearing of an approaching vessel does not appreciably change." 33 U.S.C. § 2007. Defendant's expert Arms testified that good seamanship required that Quark Speed determine whether it was on a collision course by either obtaining the vessel's bearing by using a compass or by visually lining up a fixed point on Quark Speed with a fixed point on Inkatu. Tr 351-352. It is

9

undisputed that Mitchell did not use any particular technique to determine whether the vessels were on a collision course, but instead, observed Inkatu to reach that conclusion. Tr. 56-57, 59. Arms testified that:

> So I think it can be, in different circumstances, I think it can be – very good sailors, and going back to racing, you know there's times where I thought I was going to be able to make it behind them. So that perception of boats coming at each other, even with experienced sailors, can be hard to judge out on the water, and I don't know how experienced a sailor Mitchell was. I don't have a resume of his sailing at all.

Tr. 388. The Court stated that Arms testified that "very good sailors" can visually determine when vessels area on a collision course. Findings of Fact and Conclusions of Law at 4. Although Defendant argues that the Court misconstrued Arms' testimony, the Court, as the trier of fact, determined that Arms did not testify that visually determining distances was impossible, only that it would be difficult.

Defendant argues that even if the Court disregards Arms' testimony regarding whether Quark Speed violated Rule 7, it cannot disregard Rule 7, and must allocate some fault to Quark Speed. See Snell v. Yaquina Bay, Inc., 2006 AMC 2728 (D. Or. 2006). In Snell, however, the court found that both vessels were at fault, whereas here, the Court has found that only Inkatu proximately caused this accident. Snell, 2006 AMC 2728, at *12-13. Snell does not require apportionment of fault in this case. Thus, Defendant has not shown clear error or manifest injustice in not apportioning fault to Quark Speed for any violation of Rule 7.

**7.    Defendant has not shown clear error regarding the Court's allocation of fault in this case.**

Rule 17 requires the stand on vessel to "take such action as will best aid to avoid collision." Rule 8 states that "any action taken to avoid collision shall . . . be positive, made in ample time and with due regard to the observance of good seamanship." Defendant argues that Rule 34 required Mitchell to signal to Inkatu by using his horn. Defendant argues that the Findings of Fact and Conclusions of Law demonstrate that Mitchell saw Inkatu, determined it was on a collision course, did nothing until Quark Speed was 75 to100 feet away and then made an unsuccessful attempt to change course at the last minute. Thus, Defendant argues that Mitchell violated the rules of the road by taking no action and then by taking ineffective action, and some fault should be allocated to

1  Quark Speed.  See Shaun Fisheries Inc. Limitation Proceedings, 1984 AMC 2650 (D. Or. Sept. 21,
2  1983).  In Shaun Fisheries, the court allocated fault to the stand on vessel where it took no action
3  until it was too late.  The court stated that as it became more and more probable that a collision
4  would occur, the stand on vessel should have sounded a warning signal or turned to avoid the
5  collision.  The court there allocated 50% fault to the stand on vessel, finding that both ships were at
6  fault.  However, the determination of whether violations of the rules caused damage is a fact-
7  intensive decision by the district court and it is within the discretion of the court to determine fault.
8  Nothing in Shaun Fisheries requires the Court to allocate fault in any particular way.  Further, here,
9  the Court has not found that both ships were at fault.  Defendant has not shown clear error or
10 manifest injustice in allocating fault in this case.

**8.    The Court applied the Pennsylvania rule to all parties**

Under the Pennsylvania rule, "if a vessel involved in an accident violated a statute or regulation intended to prevent such an incident, it is presumed that the ship owner was at fault, and the burden of proving causation shifts to the ship owner."  MacDonald v. Kahikolu, 581 F.3d 970, 973 (9th Cir. 2009).  Defendant argues that because Quark Speed violated Rules 2, 7, 8, 17 and 34, it should share some of the fault for the accident.

In allocating fault, the Court must weigh relative liability.  In the Findings of Fact and Conclusions of Law, the Court stated that it had "carefully reviewed each parties' individual fault," and concluded "that the accident in this case was simple and proximately caused by Inkatu's failure to keep a proper lookout."  Findings of Fact and Conclusions of Law at 10.  However, Defendant argues that the Court erred in placing the burden on Defendant, rather than on Plaintiff, to provide persuasive evidence that Inkatu could have avoided the collision.  Specifically, the Findings of Fact and Conclusions of Law state that even if Mitchell had signaled to Inkatu, "there was no persuasive evidence that Inkatu would have been able to maneuver quickly enough to avoid the collision." Findings of Fact and Conclusions of Law at 12-13.  The Court intended to convey that Plaintiff had shown by clear and convincing evidence that any failure to signal would not have proximately caused the accident because there was no evidence that Inkatu could maneuver quickly.  Therefore, the Findings of Fact and Conclusions of Law at pages 12 to 13 are amended as follows: "However,

11

even if Mr. Mitchell had signaled Inkatu by whistle or light when he realized, at 75-100 feet away, that Inkatu was not going to alter its course, Plaintiff has shown by clear and convincing evidence that the failure to signal would not have proximately caused the accident because there was no evidence that Inkatu would have been able to maneuver quickly enough to avoid the collision."

**9.     The Court did not rely on the in extremis doctrine in deciding this case.**

The Court stated: "Even assuming that the boats would have missed each other by a very small margin had they stayed on course, Mitchell acted reasonably in taking evasive maneuvers even if those maneuvers may not have been correct in retrospect.. . . Thus, the Quark Speed's turn upwind was not the cause of the collision." Findings of Fact and Conclusions of Law at 12 (citing City of Chicago v. M/V Morgan, 375 F.3d 563, 577 (7th Cir. 2004)).  City of Chicago, which the Court cited in support of its alternative ruling, applied the in extremis doctrine, but the Court did not apply it here because the peril in this case was not sudden.  Defendant has not shown clear error or manifest injustice regarding the application of the in extremis doctrine.

**10.    Defendant has not shown clear error with respect to Plaintiff's expert Denham's opinions**

Defendant argues that the Court should amend the Findings of Fact and Conclusions of Law to rule on Defendant's objections to Plaintiff's expert Denham's testimony.  At trial, the Court overruled Defendant's Daubert objection based on Denham's qualifications.  Tr. 132.  The Court has reviewed the trial transcript and found that it ruled on all of Defendant's objections made during direct examination of Denham.  Therefore, there are no outstanding objections on which to rule.

Defendant also argues that the Court's reliance on Denham's opinion that Mitchell took appropriate action by turning into the wind is inconsistent with the evidence because Denham testified that it was appropriate to turn into the wind as the only way to slow down Quark Speed, but the Findings of Fact and Conclusions of Law also state that Mitchell did not slow down.  Defendant, however, has overstated Denham's testimony, which actually stated:

> And I would say that at that point he decided, well, there's nobody there, and nobody's going to change the course, so I alone have the ability to avoid this collision, and he took the appropriate action, which is to head into the wind and to turn right, to open the distance between vessels, and which slowed him down a little bit because he lost some wind power, which basically is what's required.

12

Tr at 149.  Denham did not testify that turning into the wind was appropriate because it was the only way to slow Quark Speed down, but testified that turning into the wind would slow Quark Speed down a little bit.  Thus, the Findings of Fact and Conclusions of Law are not inconsistent.

Defendant also argues that Denham could not testify as to specific actions that a small sailing vessel should take.  However, the Court already ruled at trial that he was qualified to testify in this case.  In addition, Defendant argues that Denham's opinion that the boats were on a collision course lacks foundation and that therefore, the Court erred.  The Court, however, did not rely on any of Denham's opinions about whether the boats were on a collision course, so Defendant's argument is not well-taken.

**11.    The Court did not hold that Mitchell was an infallible sailor.**

Defendant argues that the Court considered Mitchell to be infallible, but failed to credit Defendant's many years of sailing experience.  Although the Court did not address Defendant's sailing experience, it did not consider Mitchell to be infallible.  The Court did not reach its conclusion in this case based on any belief that Cartwright was not experienced; it relied principally on the fact that his then-wife failed to maintain a lookout as he had requested.  Defendant has not shown clear error.

**12.    The Court amends the Findings of Fact and Conclusions of Law regarding causation of damages.**

Defendant argues that Plaintiff must establish that the collision caused harm to Quark Speed, and that there is little direct evidence regarding the cause of the damage to Quark Speed.  Defendant notes the lack of evidence of the pre-collision condition of Quark Speed, noting that there were no pictures or other documents presented regarding its condition, and there was no testimony at trial from Mitchell or any of Plaintiff's witnesses regarding Quark Speed's pre-collision condition.  Plaintiff's witness, Mr. Nelson, testified that he had no idea about the pre-collision condition of Quark Speed. Tr. at 438.  The Court specifically did not rely on Mr. Nelson's testimony as to causation: "even though Mr. Nelson testified as to the damage that he saw to Quark Speed, because he had no knowledge of the pre-accident condition of Quark Speed and because he was no designated as an expert, the Court does not rely on his testimony as to the *cause* of the damage." Findings of Fact and Conclusions of Law at 15 (emphasis in original).  Defendant argues that the

13

only admissible opinion evidence as to what damage was caused by the collision was from Defendant's expert Nye. Defendant argues that the Court did not address many of the items on Nye's report, and specifically on his summary of conclusions as to whether an item on the invoice was related to the collision. See Losch Decl. Ex. B.

Upon further reflection, the Court finds that Plaintiff has not established that all of the damages previously awarded by this Court were caused by the accident. As stated in the Findings of Fact and Conclusions of Law, the Court has already denied recovery of damages relating to four items that were allegedly damaged in the collision, but which were not repaired or replaced as described by invoices from Nelson's Marine. See Findings of Fact and Conclusions of Law at 16-18. However, as Defendant points out, Plaintiff has not established that several additional items that were included in the amount of damages sought by Plaintiff were caused by the collision.

For example, there are eleven items relating to electronics on Nye's report (Losch Decl. Ex. B), and there was no evidence that the electronics worked before the collision or that they would not have worked after the collision if they had simply been reattached. Nelson testified that the helm looked "smashed up" when he first saw Quark Speed, but the pictures of the damage show that the pedestal was broken off at the base with no evidence of damage to the electronics, and the original electronics were not smashed up. See Ex. F, CART000049; Ex. I, CART000098; CART 000100. Nelson's testimony that the "wheel . . . control mechanism was broken from the helm station and all the gauges and wires and stuff had been either broken or separated or damaged. The whole helm had been ripped loose from the base of the cockpit floor, where all the wires run through," (Tr. 403) is consistent with Nye's opinion that when the helm broke off, some wires were severed but the electronics were not broken. Tr. at 302-05. This testimony is also consistent with Mitchell's testimony that the helm and pedestal had been damaged or ripped off of the boat. Tr. at 63. But Plaintiff has pointed to no evidence that the electronics were functioning prior to the collision, or that the helm and pedestal, along with the severed wiring, could not have just been reattached. Although Nelson testified that certain electronics had been damaged and needed to be replaced (see, e.g., Tr. at 402-03), there has been no showing that the damage was caused by the collision with Inkatu, and the Court ruled that he could not testify regarding causation. Thus, Plaintiff's award is

14

reduced by $13,747.65 that was attributable to electronics that were either not shown to have been damaged by the collision or were not on the vessel at the time of the accident. See Losch Decl. Ex. B (items listed as S26 Corepack, Type I linear drive, ST6002+Control head, [2] E80 display[s] (see Findings of Fact and Conclusions of Law at 17 [already reducing award for one E80 display]), Raymarine radome, Raystar 125 CPS sensor, ST60+ wind system, ST60+ speed system, ST60+ depth system, Rader mount, Raytech 6.0 navigation software).

Further, Plaintiff has not established that all of the stanchions, stanchion gates and standing rigging were damaged in the collision and therefore required repair or replacement. As described by Nye, the cost for only two stanchions and stanchion gates, and part of the standing rigging was approved. Therefore, Plaintiff's award is reduced by $1,225.96. See Losch Decl. Ex. B (items listed as Stanchions (4), Stanchion gates (4), standing rigging).

In addition, Plaintiff has not shown that the damage to gel coat, lines and lights was caused by the collision. There was no showing that the lines and lights were functioning before the accident, or that the gelcoat was not damaged through ordinary wear and tear. Thus, Plaintiff's award is reduced by $2,436.37 for these items. See Losch Decl. Ex. B (items listed as Gel minor damage to engine cover, gel coat and resin, replace furler line, line, replace lines in addition to furler line that were damaged in collision, line (approximate cost), install new mast light (LED), lights, mast head, tricolor part 8457574, spreader lights (2)).

In addition, Plaintiff has not shown that it is entitled to $2,526.00 in damages for testing a refrigerator motor, cracks and miscellaneous materials unrelated to the collision and tightening bolts. There was no testimony at trial regarding the refrigerator motor, and Nye did testify that there were cracks on Quark Speed that were unrelated to the collision. See, e.g., Tr. at 256.

Defendant argues that the Court awarded double-billing for the steering assembly installation of $850, based on Nye's report stating that the complete steering assembly installation had already been invoiced on invoice number 10201404. Losch Decl. Ex. B. However, the only reference to the steering assembly on invoice number 10201404 states "Replace Steering System," in the amount of $2,550.00. Pl.'s Ex. 9 at CART 000081. Thus, Defendant has not made a showing of double billing for the same materials or work in the amount of $850.00.

15

Finally, Defendant argues that sales tax in the amount of $2,591.12 on the items listed in Nye's report is not recoverable. However, the parties did not argue at trial or in post-trial briefing as to whether Plaintiff would be entitled to recover sales tax. Therefore, Defendant has waived any argument that Plaintiff is not entitled to recover sales tax.

Accordingly, Plaintiff's compensatory damages as awarded in the Findings of Fact and Conclusions of Law are reduced by $19,935.98. Thus, the Findings of Fact and Conclusions of Law are amended to award Plaintiff compensatory damages of $44,814.40. Defendant's argument that the Court erred in ruling that Quark Speed was not a total loss is moot. Further, as stated in the Findings of Fact and Conclusions of Law, Plaintiff's damages must be decreased by 10% to account for betterment. Accordingly, Plaintiff's total compensatory damages are $40,332.96.

### 13. Defendant has not shown that the Court erred in considering invoices from Nelson's Marine.

The Court overruled Defendant's objection to the admission of Nelson's invoices on the ground that they were unreliable. Tr. at 452. The Court deferred ruling on Defendant's hearsay objection, concluding:

> . . . I doubt very much that these are inadmissible, or even inadmissible if some of it is for the truth, and a lot of it he testified was true. And I don't think you showed, you know, by the one possible mistake, total unreliability, . . .

Tr. at 455. Defendant argues in this motion that the invoices are hearsay if they are offered for the truth, and that they are not covered by the exception for records of regularly conducted business activities because the records indicate lack of trustworthiness. See Fed. R. Evid. 803(6). "The basis for the business record exception is that accuracy is assured because the maker of the record relies on the record in the ordinary course of business activities." Clark v City of Los Angeles, 650 F.2d 1033, 1037 (9th Cir. 1981) (citing Fed. R. Evid. 803(6), Advisory Committee Notes). Defendant argues that Nelson testified that the invoices were not accurate and therefore, they lack trustworthiness and cannot be admitted under the hearsay exception.

The Court noted at trial that some of the items in the invoices were accurate even though some were not (Tr. at 453-54), but Defendant argues that this means that all of the invoices were unreliable. However, the Court is not persuaded that the mistakes rise to the level of

16

untrustworthiness. The cases cited by Defendant are inapposite. See Sana v. Hawaiian Cruises, 181 F.3d 1041, 1046 (9th Cir. 1999) (ruling that the report of an insurance investigator was made in the regular course of business and therefore admissible in crewmembers' maintenance and cure action under hearsay exception for business records; vessel owner had duty to investigate crewmember's injuries, co-workers had corresponding duty to cooperate in investigation, and fulfilling such duties was usual or ordinary fact of life for maritime industry, even though there was an allegation that part of the report was not trustworthy); Paddock v. Dave Christianson, Inc., 745 F.2d 1254, 1258-59 (9th Cir. 1984) (declining to admit third party audit reports as business records of either party or of the accounting firm that created the reports because the reports were prepared in anticipation of litigation and therefore were not business records, and the court also stated that the reports were untrustworthy because they contained inaccuracies). Defendant has not shown that it was clear error for the Court to rely on those portions of the invoices that it found to be trustworthy, and to reject the parts of the invoices that were not. Accordingly, Defendant's hearsay objection to the Nelson's Marine invoices is overruled based on the business records exception to the extent that the Court found the invoices to be accurate.

### 14. Defendant has not shown clear error regarding the Court's analysis of betterment.

Defendant argues that the Court erred in putting the burden on Defendant to show betterment. Regarding betterment, the Court stated:

> The Court concludes that the repairs, in particular the television described above, resulted in unnecessary betterment. See Pizani, 669 F.2d at 1088 (stating that a defendant cannot be liable for damages that enhance the value of the damaged property beyond its pre-accident condition). Although Mr. Nye opined in his January 4, 2008 report that a decrease of thirty-five percent for betterment should be applied to the final agreed upon value, that estimate was made based only on his initial inspection and invoices from Nelson's Marine. He had not conducted another inspection of Quark Speed after August 2007 and before the January 2008 report, and during that time, the bulk of the repair work had been done, some of which was different than the work described on the estimates. Thus, his betterment estimate is inflated. At the same time, Mr. Nelson testified that some of the electronics on Quark Speed were upgraded and that the owners were "very much into the electrical gadgets on the boat," and the Court concludes that only some of that may have been necessary to obtain comparable equipment. Tr. at 419. Accordingly, the Court will apply a decrease of 10% for betterment. Thus, Plaintiff's compensatory damages are reduced to $58,275.35.

Findings of Fact and Conclusions of Law at 18. As stated in the Court's Findings of Fact and

Conclusions of Law, because Nye's betterment estimate was based on a lower repair estimate before additional repairs were made, the percentage was inflated. Although Defendant disagrees with the Court's ruling, it has not shown clear error or manifest injustice.

**C.     Conclusion**

The September 19, 2011 Findings of Fact and Conclusions of Law are amended as stated in this Order. The judgment in favor of Plaintiff is reduced to $45,832.96 (compensatory damages of $40,332.96 plus salvage of $5,500 as stated in the Findings of Fact and Conclusions of Law). The Court will issue an amended judgment reflecting the rulings in this Order after the parties file their stipulation regarding prejudgment interest.

**IT IS SO ORDERED.**

Dated: December 5, 2011

*Elizabeth D. Laporte*
ELIZABETH D. LAPORTE
United States Magistrate Judge